# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE: ANC RENTAL CORPORATION, et al.

        Debtors

_____

ANC RENTAL CORPORATION, et al.

        Appellant               Civil Action No. 04-1428

v.

TARRANT COUNTY, ET AL.

        Appellees           Bankruptcy Case No. 01-11200

---

## APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE
### HONORABLE MARY F. WALRATH

---

## BRIEF OF APPELLANT ANC RENTAL CORPORATION, ET AL.

---

Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
STEVENS & LEE, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Telephone:  (302) 654-5180
Telecopier:  (302) 654-5181

Joseph M. Harrison IV
J.M. HARRISON & ASSOCIATES
1009 C Street, Suite 200
Floresville, Texas 78114-2223
Telephone:  (830) 393-0500
Telecopier:  (830) 393-4941

ATTORNEYS FOR APPELLANTS

DATED: August 12, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iv

A.    STATEMENT OF THE BASIS OF APPELLATE JURISDICTION .................... 1

B.    STATEMENT OF THE ISSUES PRESENTED ..................................... 1

C.    STATEMENT OF THE FACTS .......................................... 2

D.    ARGUMENT ....................................................... 3

    1.    The History of, and Remedial Purposes Behind, 11 U.S.C. § 505      3

    2.    In its Flawed Construction of § 505, The Bankruptcy Court Mis-Applied the Third Circuit Court of Appeals Holding in *In Re: Custom Distributing*      8

    3.    *Custom's* Own Wording and Reasoning Refutes Applicability to Unpaid Taxes      14

    4.    *Cumberland Farms*, Relied on by Appellees, In Fact Supports the Same Conclusion      16

    5.    The Flawed Reasoning of Custom Distributing as Applied to Refund Claims      19

E.    CONCLUSION .................................................... 23

SL1 564121v1/011002.00003

# TABLE OF AUTHORITIES

## *Cases*

City of Perth Amboy v. Custom Distributing Services (In Re: Custom Distributing), 224 F. 3d 235 (3rd Cir. 2000) ..................................................................8-10, 13-16, 18, 19, 21

City Vending of Muskogee Inc. v. West Oklahoma Tax Commission, 898 F. 2d 122, 124-25 (10th Cir. 1990), cert. den'd. 498 U.S. 823 (111 S.Ct. 75), 112 L. Ed. 2d 48 (1990)....17

Connecticut National Bank v. Germain, 503 U.S. 249, 252 (1992) ..................................22

Ernst & Young v. Motsumoto (In re United Ins. Managerial, Inc.), 14 F.3d 1380, 1383 (9th Cir. 1994).......................................................................................................................1

Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000) .22

In Re Cumberland Farms, Inc., 175 B.R. 138 (Bankruptcy D. Mass., 1995)....................16

In Re St. Johns Nursing Home, Inc., 154 B.R. 117, 125 (Bankr. D. Mass. 1993), aff'd, 169 B.R. 795 (D. Mass. 1994) ......................................................................................9, 10

In Re: Penking Trust, 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996)................13, 17

In re AWB Assocs., G.P., 144 B.R. 270, 277 (Bankr. E.D. Pa. 1992) ........................11, 17

In re Fiedel Country Day School, 55 B.R. 229, 231 (Bankr. E.D.N.Y. 1985) ............11, 17

In re Galvano, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990).........................................11, 17

In re Piper Aircraft Corp., 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994)......................11, 17

Midland Asphalt Corp. v. United States, 489 U.S. 794, 798, 103 L. Ed. 2d 879, 109 S. Ct. 1494 (1989)........................................................................................................................1

## Statutes

11 U.S.C. § 505..........................................................................................1, 2-13, 15-22

11 U.S.C. § 505 (a)(2)(B) ...............................................................5-10, 14, 16, 17, 19, 20

11 U.S.C. § 505 (a)(2)(B)(i) ...................................................................................... 1-4, 14

11 U.S.C. § 505(a)(1) ................................................................................................ 5-7, 9

11 U.S.C. § 505(a)(1)(A) .............................................................................................7, 13

11 U.S.C. § 505(a)(2)(A) ............................................................................... 1, 3-7, 10-12

11 U.S.C. §§ 1101 et. seq ...............................................................................................2

28 U.S.C. § 158(a) ..........................................................................................................1

Federal Rule of Bankruptcy Procedure 8001 ...............................................................1

Tex. Tax Code Ann. § 26.01 (Vernon 2001) ...............................................................12

Tex. Tax Code Ann. § 41.44 (Vernon 2001) ...............................................................11

Texas Tax Code Chapter 32 ............................................................................................4

SL1 564121v1/011002.00003

## A.     STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The United States District Court for the District of Delaware (the "District Court")

has appellate jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) and Federal Rule of

Bankruptcy Procedure 8001. The Order issued by the Bankruptcy Court constituted a final

order for purposes of appellate jurisdiction because it disposed of all claims for relief raised

in ANC's adversary complaint.  See *Midland Asphalt Corp. v. United States,* 489 U.S. 794,

798, 103 L. Ed. 2d 879, 109 S. Ct. 1494 (1989); *Ernst & Young v. Motsumoto (In re United*

*Ins. Managerial, Inc.)*, 14 F.3d 1380, 1383 (9th Cir. 1994).

## B.     STATEMENT OF THE ISSUES PRESENTED

1.     Did the Bankruptcy Court err in dismissing ANC's claim for relief seeking

determination of the amount of <u>unpaid</u> tax year 2001 taxes on the grounds that these taxes

had not been "properly" protested with local authorities?

2.     Did the Bankruptcy Court err in transmuting the "properly requests" language

contained in U.S. Bankruptcy Code  § 505 (a)(2)(B)(i) dealing with determinations of the

estate's right to a tax <u>refund</u>, into a non-existent "properly protest" requirement with respect

to the instant 2001 tax year claims for relief involving <u>unpaid</u> taxes?

3.     Did the Bankruptcy Court err in holding that it had no jurisdiction to

determine unpaid taxes under U.S. Bankruptcy Code § 505 (a)(2)(B)(i) unless they had been

"properly protest[ed]," with local tax authorities, given that Code § 505 contains no such

requirement?

4.     Where Congress, in enacting U.S. Bankruptcy Code § 505, included an

express requirement that Debtors seeking refunds under § 505 must first present such

requests to the affected governmental unit, but chose not to include such a requirement as to unpaid taxes, did the Bankruptcy Court err in "reading in" a purported "proper protest" requirement as to unpaid taxes, contrary to the maxim of statutory interpretation, *expressio unius est exclusio alterius*?

5.    Did the Bankruptcy Court err in expanding, by implication, a Bankruptcy Code provision, §§ 505 (a)(2)(B)(i), which by its express terms is applicable only to requests for tax <u>refunds</u>, to apply to a non-refund situation to which the provision has no application?

6.    Did the Bankruptcy Court err in adopting an interpretation of §505(a)(2)(B)(i) which is fundamentally inconsistent, and would largely emasculate, companion    §§ 505(a)(2)(A)?

7.    Did the Bankruptcy Court err in adopting an interpretation of §505(a)(2)(B)(i) which is fundamentally inconsistent with the legislative history and remedial intent underlying § 505 and other specific limitations expressly contained therein, such as §505(a)(2)(A)?

## C.    STATEMENT OF THE FACTS

ANC RENTAL CORPORATION, ("ANC") the Debtor and Appellant herein, filed for protection under Chapter 11 of the U.S. Bankruptcy Code, 11 U.S.C. §§ 11.01 et. seq. in the U.S. Bankruptcy Court for the District of Delaware.  Thereafter, on December 10, 2003, ANC filed adversary complaints against Defendants Tarrant County[1], City of Euless, (collectively the "Tax Authorities"), Grapevine-Colleyville Independent School District,

---

[1]This Appellee includes the Tarrant County Community College District, for whom the County collects taxes

SL1 564121v1/011002.00003

("GCISD"), and Tarrant Appraisal District, ("TAD"), Appellees, asking the Bankruptcy Court to determine the correct amounts of ANC's tax liability to Appellees in accordance with 11 U.S.C. § 505 for ANC's airport rental car fleet for tax years 1999, 2000 and 2001. ANC sought partial refunds of previously paid 1999 and 2000 taxes, and a reduction of amounts due for unpaid 2001 taxes (hereafter, the "Unpaid Taxes").[2]

Appellee TAD filed a Motion to Dismiss, to which the Tax Authorities filed a joint response. GCISD joined in TAD's motion. The court granted the Motion to Dismiss as to all years and claims at issue.

## D.     ARGUMENT

### 1.     The History of, and Remedial Purposes Behind, 11 U.S.C. § 505

Although the language of Bankruptcy Code § 505 is relatively clear and direct, and requires little resort to legislative intent to determine the meaning of its express language, a brief reference to this section's legislative history illustrates the internal coherence of the section as a whole, and how the Bankruptcy Court's attempt to graft a "proper request" requirement to non-refund situations would be fundamentally at odds with § 505's mechanisms and purposes.

Congressional commentaries accompanying the enactment of § 505 and its predecessors reveal a simple, logical concern by congressional sponsors; that struggling companies limping towards bankruptcy might be too preoccupied with a variety of basic

---

[2]The 2001 taxes were recently paid under protest and with reservation of rights under the instant appeal, and ANC has initiated refund request procedures on the associated excess.

SL1 564121v1/011002.00003

corporate survival issues to be vigilant and thorough in challenging excessive tax assessments under applicable non-bankruptcy procedures.

Adding to the potential impact of such a scenario is the fact that a variety of taxes, particularly state and local property taxes, are secured by statutory liens that, pursuant to state law, prime most or all other secured parties with an interest in the same property, even if those interests arose prior to the tax claim. Texas ad valorem tax law, here at issue, represents just that scenario. Under Texas Tax Code Chapter 32, ad valorem tax liens take precedence over all but a small handful of secured interests.

The obvious concern, as legislative commentaries and reported cases reflected, was that struggling debtors might fail to effectively challenge and excessive tax assessments, leaving the estate and secured parties burdened by excessive unsecured tax claims.

To safeguard debtors and secured creditors against permanent loss from such excesses, Congress enacted § 505's predecessor statute as part of the old Bankruptcy Act, then re-codified this provision as § 505 in the modern Bankruptcy Code. Certain of these specific provisions and express limitations contained in § 505 further illustrate the above-described purposes. For example, § 505(a)(2)(A) expressly bars resort to § 505 where the amount or legality of the subject tax, fine, penalty, etc. was "contested before and adjudicated by" a competent judicial administrative body prior to the bankruptcy filing.

This express "carve out" of the Court's § 505 jurisdiction makes complete sense in the context of the owner-described concerns which lead to its enactment. Whereas debtors who have in fact been too distracted to diligently contest taxes under state or local procedures need the remedial protections of § 505, where the subject tax was, in fact,

4

contested and that contest adjudicated prior to the bankruptcy filing, the protective concerns underlying § 505 do not apply, since the taxpayer managed to exercise its protest rights, notwithstanding any financial extremis or distractions.

The other relevant express statutory limitation to the Bankruptcy Court's authority under § 505 appears in the very next subsection, §§ 505 (a)(2)(B), addressing the "right of the estate to a tax refund," and requiring that any Bankruptcy Court claims for such refunds under § 505 be first preceded by presentation of a proper request for such refund to the affected governmental unit.

Like the above-discussed jurisdictional "carve out" of § 505(a)(2)(A), this prerequisite to a prior refund request is, considered in the proper context, unsurprising. Challenges to unpaid taxes are one thing -- by definition, tax offices do not yet have the contested funds in hand, the dispute is over what is the correct amount or amounts that should be paid under applicable state law, and governmental offices are not facing the prospect of a potential requirement that they disgorge a portion of funds already paid, budgeted and spent. By contrast, refund requests, and, where warranted, final court orders requiring refunds of previously-paid taxes, are by their very nature more intrusive and burdensome on the same governmental units.

Section 505 opens with § 505(a)(1), which generally authorizes courts to determine "the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." Starting with this broad, nearly all-encompassing jurisdictional language in § 505 (a)(1), there can be

little question of the lower court's general jurisdiction to determine "the unpaid 2001 property taxes contested by ANC."

Following § 505 (a)(1) are the two aforementioned expressed limitations to that jurisdiction, § 505(a)(2)(A) prohibiting § 505 relief if the subject taxes were previously protested and that protest adjudicated prior to the bankruptcy filing. As the bankruptcy court itself noted in flawed support for its erroneous ruling, these taxes were not protested (much less adjudicated) pre-petition, thus the restrictions of § 505(a)(2)(A) are inapplicable. The last express restriction, contained in § 505(a)(2)(B), deals solely with "any right of the estate to a tax refund," which is what ANC was requesting as to 1999 and 2000, but not the relief requested as to the unpaid 2001 taxes.

It was with respect to the interpretation of this subsection that the Bankruptcy Court committed its fundamental error in reasoning, moving seamlessly from its discussion of the basis for dismissal of ANC Adversary proceeding as to tax years 1999 and 2000 based on lack of proof of the required prior refund request, to an erroneous application of the "properly request" language to the unpaid 2001 taxes.

This interpretation is fundamentally erroneous based on the structure of § 505, which first, as noted, clearly grants the Bankruptcy Court authority to determine unpaid taxes, then restricts that authority only in area of prior protests and adjudications. The refund limitation simply has no application here.

Consider, also, the practical implications of the Bankruptcy Court's interpretation. The lower court ruled that the 2001 taxes were not subject to relief under § 505 because they had not been "properly protested" at an earlier date with local tax authorities. Ignoring, for a

6

moment, the obvious fact that there is no such "proper protest" requirement anywhere in §

505, reading this provision as the Bankruptcy Court suggests would eliminate its availability

in almost every situation.

Here, the Court dismissed ANC's 2001 action because ANC had not previously

protested the issue of valuation with the local Texas appraisal districts, a process it would

have to have undertaken pre-petition. However, had ANC in fact protested value pre-

petition and obtained an adjudication of that protest (like most such protests sometime during

the summer of 2001) it would have been barred from seeking relief under § 505 by the

"carve out" provisions of § 505(a)(2)(A).

Thus, the Bankruptcy Court's mis-application of the "properly requests" concept to

unpaid taxes would essentially obliterate any application of § 505 to the determination of

unpaid taxes. This result is fundamentally inconsistent with basic tenets of statutory

construction favoring an interpretation which gives efficacy to the entire statute, not to

mention fundamentally and irrevocably at odds with the broad enabling language of §

505(a)(1). Nor do the cited cases supporting dismissal of refund claims absent proof of the

"proper request" required by §§ 505(a)(2)(B) and any application to a situation involving

unpaid taxes.

Both the broad and general jurisdictional enabling language of § 505(a)(1)(A) and

the specific, targeted exceptions and limitations which follow evidence the carefully crafted

remedial mechanisms which this section represents. While neither ANC nor any other

bankruptcy debtor or party in interest should rightfully expect Bankruptcy Courts to extend

§505 relief to situations and fact patterns beyond the express scope of the statutory enabling

language, given Congress' inclusion of specific, circumscribed limitations and exceptions to § 505 relief, Bankruptcy Courts should not try to "read into" the express, unambiguous language of the section additional restrictions which simply do not exist. Unfortunately, the decision of the Bankruptcy Court below reflects just such an error. Reversal and remand is, therefore, warranted, and essential.

2.    **In its Flawed Construction of § 505, The Bankruptcy Court Mis-Applied the Third Circuit Court of Appeals Holding in *In Re: Custom Distributing***

The bankruptcy court here unquestionably mis-applied the Third Circuit's reasoning in *City of Perth Amboy v. Custom Distributing Services (In Re: Custom Distributing)*, 224 F. 3d 235 (3rd Cir. 2000). In a concluding section of this brief, ANC will outline the logical inconsistencies inherent in the expansive reading applied to the two-word phrase "properly request" by the Court of Appeals in the *Custom Distributing* decision with respect to the scope of bankruptcy court authority to order tax refunds under Code § 505.

First, however, and recognizing that *Custom*, flawed or not, reflects current Third Circuit law on the issue of refund authority, ANC begins with a more fundamental and, it believes, virtually irrefutable point: The bankruptcy court unquestionably mis-applied *Custom* and its reasoning in the instant appeal to situations not involving refund claims, but, rather, underpaid taxes.

A methodical review of *Custom* confirms that the Third Circuit's reasoning and holdings, tied inexorably as they are to interpretation of the term "properly requests" as it appears in Code § 505(a)(2)(B), can **only** be applied to refund situations, not to requests for determination of unpaid taxes. Here, the Bankruptcy Court dismissed ANC's § 505 action

8

even as to what were, as of the dismissal date, challenges to the correct amount of **unpaid** taxes (hereafter, "the unpaid accounts").

This conclusion is virtually inescapable, in that **§§** 505(a)(2)(B) only addresses bankruptcy court authority to order refunds, and does not otherwise address or restrict the court's general authority to reduce excessive taxes under **§** 505. Indeed, the Third Circuit recognized as much in *Custom*, noting that is was "undisputed by either party that the bankruptcy court had jurisdiction, pursuant to **§** 505(a)(1), to reduce Custom's property tax assessments for the 1992 through 1997 tax years." Id., 224 F. 3d, at 240. In *Custom*, taxes for years 1992 through 1994 had been previously paid in full, 1995 partially paid, while 1996 and 1997 remained completely unpaid. Ultimately, these last three years, involving partly paid and unpaid taxes, were remanded to the district court for further proceedings. Id., at 247.

In discussing the appropriate interpretive scope of the phrase "properly request," the Third Circuit cited *In Re St. Johns Nursing Home, Inc.*, 154 B.R. 117, 125 (Bankr. D. Mass. 1993), aff'd, 169 B.R. 795 (D. Mass. 1994) for the proposition that the term "properly" connotes correctness and dictates conformity with the governmental unit's procedures, and that "if the statute did not have this meaning, the word properly would be superfluous." Id., 154 B.R., at 125.

If *St Johns'* reasoning is correct, consider the impact that the bankruptcy court's findings in the instant case with respect to the unpaid accounts on the integrity and internal consistency of Code **§** 505 as a whole.

9

In *St. Johns*, the court worried about the impact on the single term "properly." In the instant case, the bankruptcy court's unfounded extension of the "properly request" concept beyond **§§ 505(a)(2)(B)** to situations involving <u>unpaid</u> taxes would render not just one word, but rather the entire preceding **§§ 505(a)(2)(A)**, largely superfluous. The basis for this conclusion is simple. The bankruptcy court found, as to the unpaid accounts, that the court lacked jurisdiction to grant relief because ANC had not properly protested such amounts at the time. Yet in *Custom*, the bankruptcy court's general **§ 505** authority to reduce assessments was unchallenged, only refund authority being at issue.

Moreover, while the *Custom* court did find that Custom Distributing's failure to timely challenge assessed valuations under New Jersey law left them unable to "properly request" a tax refund consistent with the requirements of state law, this finding, too, arose <u>specifically in the context of interpreting the court's authority to order refunds</u> under the "properly request" standard of **§§ 505(a)(2)(B)**.

Absent a refund situation, none of the reasoning of *Custom* ever comes into play. That distinction lies at the heart of the fundamental logical disconnect in the lower court's reasoning. Not only has the bankruptcy court misapplied interpretative statutory language from Code **§ 505(a)(2)(B)** to a non-refund situation to which, by definition, has no applicability, but adopting this bizarre "rewrite" of **§ 505** to extend the "properly request" requirement to non-refund scenarios would largely emasculate an entire subsection of **§ 505**, if not most applications of **§ 505** generally.

In *Custom*, the Court concluded that **§ 505(a)(2)(B)** was "unclear," and thus found it appropriate to "proceed to its legislative history for guidance." *Custom Distributing*, 224 F.

10

3d, at 241.  A part of that legislative history is the well-recognized purpose behind the remedial mechanisms created by § 505 and its predecessors:  protecting creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing financial condition, failed to contest.  See *In re Piper Aircraft Corp.*, 171 B.R. 415, 418 (Bankr. S.D. Fla. 1994); *In re AWB Assocs.*, G.P., 144 B.R. 270, 277 (Bankr. E.D. Pa. 1992); *In re Galvano*, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990); *In re Fiedel Country Day School,* 55 B.R. 229, 231 (Bankr. E.D.N.Y. 1985).

This purpose, as originally envisioned, is reflected both in the breadth of broad general remedial authority with which § 505 begins, and also, conversely, by limitations such as §§ 505(a)(2)(A), which prevents a proverbial "second bite of the apple" by debtors who in fact proved themselves capable of acting timely and thoroughly to preserve and vindicate their available remedies under state law.

Consider this underlying intent, not to mention the express wording of limiting provision §§ 505(a)(2)(A), in the context of the bankruptcy court's ruling here.  The court found, in essence, that ANC would have to have timely protested the unpaid 2001 accounts (citing the failure to "properly protest") in order to have been entitled to court relief under § 505 as to even unpaid taxes.

However, Texas, like many state tax appeal systems, requires that assessment challenges (which Texas calls "protests") be filed relatively early in the tax calendar in order to facilitate finalizing of tax rolls and issuance of bills.  In Texas, protests are generally due by May 31 or within 30 days after issuance of a notice of appraised value, Tex. Tax Code Ann. § 41.44 (Vernon, 2001), and most unresolved protests are heard and adjudicated by

11

local appraisal review boards by late July. This time frame is particularly applicable with respect to moderate to larger size commercial accounts, since appraisal review boards are generally required to certify their local appraisal rolls by July 20 and include not less than 95 percent of the county-wide appraised value in that certification. Id.,e.g. § 26.01.

As a result, had ANC timely protested the subject unpaid 2001 accounts, as this court held it must, the protest would have almost certainly been adjudicated by Appellees' appraisal review well before ANC's November 13, 2001 bankruptcy filing, with said adjudication barring any right to relief under § 505 pursuant to the restriction imposed by §§ 505(a)(2)(A). Conversely, failing to protest these accounts in the Spring of 2001 would, per the bankruptcy court's reasoning, bar § 505 relief due to the taxpayer's failure to "properly protest," a phrase nowhere found in § 505.

For debtors like ANC, filing for bankruptcy relatively late in the tax year,[3] the implications of the bankruptcy court's reasoning are both clear and ominous: Although Congress took the time to craft, debate and enact § 505 and its statutory predecessors to protect debtors and case creditors against pre-filing administrative appeals oversight and/or tax collector overreaching, debtors and creditors will be, in most cases, barred from invoking the section's remedial purposes.

---

[3]By this time of year, most protests or other administrative appeals, if filed at all by a financially-buckling entity, would already have been adjudicated.

SL1 564121v1/011002.00003

Fail to protest value during the original tax year (the very scenario prompting enactment of § 505's predecessor), and this court will analogize that to a failure to properly request refunds, without any support for that analogy either in § 505's wording, or interpretive case law.   Protest timely, and, provided the protest is heard in reasonably prompt fashion (i.e., prior to the bankruptcy filing), and §§ 505(a)(1)(A) bars further relief. Put more simply:  "Heads, the tax office wins, tails you lose."

*In Re: Penking Trust*, 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996) another in a line of cases preceding *Custom Distributing* and on which *Custom's* reasoning relies, also reiterates the clear and sharp distinction between restrictions on what it asserts as bankruptcy court authority to order refunds, versus the acknowledged general authority of bankruptcy courts to determine tax liability under § 505 in non-refund situation.

In fact, in responding to case arguments therein by the trustee in support of the court's refund authority, the *Penking* court went out of its way to generally endorse the cited cases, while distinguishing them on the grounds that they involved not refunds, but simply the court's general authority to determine taxes under §  505.  Id., at 396.

This general authority, when invoked in connection with determination of unpaid taxes, appears beyond serious question, and in fact, as noted in *Penking*, has long been a part of the law, extending back prior to passage of the 1978 Bankruptcy Code.  Courts have argued whether or not that 1978 Code was intended to alter pre-existing law to extend court authority in the area of refunds.  Never in question, however, was the long-standing authority of these courts to make determinations with respect to unpaid taxes.  See, Id.

13

3. ***Custom's* Own Wording and Reasoning Refutes Applicability to Unpaid Taxes**

Repeated references throughout the *Custom* opinion confirm its focus solely on the issue of tax <u>refunds</u>.  For example, after acknowledging the undisputed question of the court's general jurisdiction "to reduce Custom's property tax assessment" the court notes that " [t]he more difficult task lies in defining the precise contours of the jurisdictional grant embodied in § 505 with regard to refunds and offsets of taxes already paid by Custom."  Id., 224 F. 3d, at 240.

The court next defines the appellate task as one of "evaluating the City's claim that the 'properly request' requirement of §§ 505(a)(2)(b)(i) requires the debtor to file a claim for refund in accordance with the procedures set out by the taxing authority."  Id.  Following that is a lengthy analysis of the perceived meaning of the "properly request" language found in §§ 505(a)(2)(b).  The subject of the "request" referred to by this term is, obviously, refund requests, not any other form of request conceivably dealing with unpaid taxes.

Further on, the court specifically refers to "policy considerations that compel us to read the 'properly request' language of §§ 505(a)(2)(b)(i) as creating a jurisdictional bar against adjudicating <u>refund claims</u> that are raised for the first time in a bankruptcy proceeding."  Id., at 243 (emphasis added).  Ultimately, the Third Circuit concluded that "the bankruptcy court did not have jurisdiction to order the City to refund excess payments for those years in which Custom paid the taxes but did not contest them in accordance with N.J.S.A. 54:3-21.  Accordingly, the overpayments made by Custom for the 1992, 1993 and 1994 tax years cannot be refunded."  Id., at 243-4.

14

Stating the obvious, all of the Third Circuit's reasoning and conclusions as cited hereinabove refer specifically, and solely, to bankruptcy court authority to order <u>refunds</u> of paid taxes, an interpretation of the "properly request" language contained squarely in the refund limitations provision of Code **§** 505. Nowhere in the court's opinion does it state (or even infer) that the "properly request" concept can, or should, be applied to situations involving unpaid taxes. In fact there is, of course, no basis in the express statutory language of **§** 505 for doing so, and the balance of the Third Circuit's opinion, if anything, strongly implies just the opposite.

In *Custom*, the bankruptcy court, as cited above, first addressed and disposed of tax years 1992 through 1994, which had previously been paid in full and as to which Custom sought partial refunds. However, there were also three other years, 1995, which had been partially paid, and unpaid tax years 1996 to 1997. After addressing an alternative argument that refunds could be sought in the form of offsets (briefly discussed hereinbelow) and spending some time on analysis of pertinent expert testimony and related evidentiary issues, the court remanded tax years 1995 through 1997 to the district court for further proceedings.

None of these tax years had been the subject of previous protests or appeals at the state level. Obviously, then, had it been proper to engraft the "properly request" concept onto situations involving unpaid taxes (as the bankruptcy court did in the instant case), the Third Circuit would presumably have done so in *Custom* with respect to years 1995 to 1997, and in so doing disposed of the entire case on appeal without need for remand. However, the court, instead, expressly (and rightly) chose not to do so, as, indeed, no logical extrapolation

15

from the express language of **§** 505 would support its use to dismiss claims for determination

of unpaid taxes absent pre-bankruptcy appeal and adjudication.

### 4. *Cumberland Farms*, Relied on by Appellees, In Fact Supports the Same Conclusion

Further indication that the Third Circuit would have considered this bankruptcy

court's artificial analogy inappropriate can be found in *In Re Cumberland Farms, Inc.*, 175

B.R. 138 (Bankruptcy D. Mass., 1995), an opinion cited by the Third Circuit in *Custom* as

the very foundation for its conclusions.  (See detailed discussion of *Cumberland Farms*

holding and the Third Circuit's characterization as the "first case in which there was analysis

of **§** 505 in its legislative history."  *Custom*, 224 F.3d, at 242.)  The *Custom* opinion leaves

little doubt as to the court's heavy reliance upon the analysis in *Cumberland Farms*.

Significantly, *Cumberland Farms* involved refund requests concerning multiple tax

years for which taxes had previously been paid (and which the court found that bankruptcy

courts had no authority to order) and a single unpaid tax year, 1992.  Although the court

ultimately chose to abstain from substantive relief (based on specific aspects of the plan of

reorganization and perceived impact on the estate and estate creditors not pertinent here) on

the underlying question of jurisdiction to grant relief, the *Cumberland* court express no doubt

that it had jurisdiction, stating,

> "The court's jurisdiction is quite different with respect to the unpaid 1992 taxes.   Unlike its provision concerning tax refund claims, Section 505 contains no language showing deference to state procedure on unpaid taxes."

*In Re Cumberland Farms, Inc.*, 175 B.R. 138, at 142-3 (emphasis added).

16

Bankruptcy courts have recognized the simple purpose behind the 120 day refund request provision of Code **§§** 505(a)(2)(B), namely to "afford the taxing authority a reasonable opportunity to review any refund claim under its normal administrative procedures."  See, e.g. *In Re Penking Trust*, 196 B.R. 389 (Bankruptcy Court E.D. Tenn. 1996), at 393.  Equally undisputed is the fundamental remedial purpose underlying **§ 505**, that of providing a ready forum for "prompt resolution of a debtor's tax liability," and affording protection against "dissipation of the estate's assets which could result if the debtor failed to challenge a pre-petition assessment."  Id., citing *City Vending of Muskogee Inc. v. West Oklahoma Tax Commission*, 898 F. 2d 122, 124-25 (10th Cir. 1990), cert. den'd. 498 U.S. 823 (111 S.Ct. 75), 112 L. Ed. 2d 48 (1990).

Other cases have similarly held that **§ 505** was enacted primarily to protect creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing financial condition, failed to contest.  See, e.g., *In re Piper Aircraft Corp.*; *In re AWB Assocs., G.P., supra; In re Galvano*, 116 B.R. 367, 372 (Bankr. E.D.N.Y. 1990); and *In re Fiedel Country Day School*, cited *supra*.

The "proper request" requirements of **§§** 505(a)(2)(B) is clearly an exhaustion of remedies provision intended, as many of the cases applying it confirm, simply to provide constituent taxing units with a full opportunity to consider refund requests on their merits before the matter is presented to the Bankruptcy Court for determination of the merits. Given that reality, one more logical (and arguably less punitive to debtors and non-tax office creditors) approach by Bankruptcy Courts confronted with refund requests first presented to a taxing unit by formal **§ 505** pleadings would be to stay relief until the 120 days has passed.

17

Another option would be to accept and rule on the request for relief, provided the debtor reimburse the taxing unit for costs for failure to first present the refund request by letter. These and other practical alternatives geared to effectuating § 505 and safeguarding rights of debtors and other case creditors (rather than simple procedural rejection of the request) exist, as more equitable alternatives to the holding in *Custom Distributing*.

*Custom* also expressly cited, discussed and appears to have relied upon language contained in the then-proposed Bankruptcy Reform Act of 1999, limiting the scope of § 505 refund authority to state level procedural and time frames. That provision was eventually enacted in April of 2005 as part of the Bankruptcy Reform Act, and when it takes effect October 17, 2005 to new bankruptcy cases filed on or after that date, will, for the first time, create express bankruptcy code language limiting § 505 relief according to state level time and procedural requirements. These provisions obviously have no application to ANC's Chapter 11 proceedings.

Inclusion of such specific restrictions in the recently enacted reform legislation are compelling evidence that they were not a part of existing bankruptcy law, and renders the Third Circuit's reliance on contemplated "future law" anomalous and inappropriate. Notwithstanding *Custom's* exhaustive court discussion of legislative history in an effort to justify an opposite conclusion, the version of § 505 applicable here simply does not limit § 505 relief to the time frames and procedural requirements found under state law.

For two of the years, protests were filed but withdrawn. There are various well-reasoned bankruptcy opinions holding that a Texas protest which is filed but then withdrawn does not constitute an "adjudication" such as to bar subsequent relief under § 505.

Nor does the bankruptcy court's opinion indicate that the withdrawal and protest was held to be an adjudication. Rather, the court took the "properly requests" language from §§ 505(a)(2)(B) and applied it (clearly in error), to the issue of protests, concluding that ANC had not "properly protested" valuation.

**5.    The Flawed Reasoning of *Custom Distributing* as Applied to Refund Claims**

Even local taxing units and other proponents of the *Custom Distributing* holding would be hard pressed to deny that the court went out of its way to construct a foundation (based on its interpretation of the legislative history of § 505 and its progeny) for an expansive definition of the term "properly requests" which goes far beyond the meaning one would naturally ascribe to these two words at first glance.

In order to delve into a lengthy, subjective discussion of legislative history, the court had to first find, as it did, that the § 505 was ambiguous. Yet it need not have so held. One obvious intent of §§ 505(a)(2)(B) recognized by numerous cases (including some generally supportive of the *Custom* rationale) is to force a trustee or debtor in possession to "properly request" refunds from the affected taxing unit first, and allow up to 120 days for a response, simply to ensure that tax units have an adequate opportunity to intelligently evaluate and respond to refund requests before a busy court is drawn into the dispute.

Even in this context, § 505(a)(2)(B) makes perfect sense as a simple "exhaustion of remedies" provision not unlike many such provisions found throughout state and federal tax law. Not surprisingly, most, if not all, such provisions require that the prior administrative action, either at the time of initial filing or upon presentation to the particular administrative

body, be carried out with sufficient detail and information so as to allow that administrative body to intelligently consider and decide the dispute on its merit.

A bald allegation of overassessment and/or request for refund, without supporting facts or analysis, does nothing to facilitate early, administrative-level resolution of disputes.

Viewed in this context, a simpler and far more logical interpretation of the term "properly request" in § 505(a)(2)(B) is that the legislature simply meant to require that the taxpayer not only present the request first to local taxing authorities and allow them up to 120 days to respond, but also submit a "proper" request, in the sense of furnishing sufficient explanation, analysis and, as applicable, data to allow the taxing unit to meaningfully consider the subject request on its merits.

Most observers would agree that a refund request lacking any explanation of its supporting analysis and rationale and thus frustrating any tax unit's attempt to consider it on its merits, would not be a "proper" request.  The simple words "properly request" readily imply such a requirement, and the court could, and should, have gone no further than this obvious meaning.

Given the level of detailed explanation of various procedural requirements contained not only throughout other code sections generally, but even specific to §505 (consider, for example, the mechanisms laid out in § 505(b)), had Congress intended the meaning of "properly request" ascribed by *Custom* and its progeny, it could have easily set out detailed requirements for preparing and presenting  refund requests in strict conformance with all state and local procedural details and time frames, as well as all state law administrative conditions preceding, as an absolute pre-condition to refund relief under §505.

*Custom* cited various provisions in then-draft bankruptcy legislation which will have the effect of creating such express requirements for cases filed after October 17, 2005, yet none of that language applies to this matter.  Nonetheless, *Custom* and other courts following its rationale have chosen to "read in" such unenacted language and, as a result, create absolute threshold jurisdictional bars to taxpayer relief even in situations of unquestionably excessive valuation and assessment.

One inherent and fundamental problem with the reasoning of *Custom* and its progeny is that it utterly destroys, at least in this procedural context, the traditional distinctions between of <u>substantive</u> and <u>procedural</u> state law in federal court proceedings.  Numerous decisions throughout the years have recognized this fundamental distinction.

For example, federal actions properly brought in federal court not by reason of a federal law cause of action, but rather, diversity jurisdiction, contemplate application of forum state substantive law, yet remain governed by federal procedure.  More specific to the current situation, various bankruptcy courts have recognized the propriety of applying substantive state law (for example, the applicable state valuation standard) to disputes arising under Bankruptcy Code § 505.

All of these decisions, historically, have held that federal bankruptcy courts addressing such disputes should apply, and be controlled by, state and local procedural provisions in the handling of a § 505 matter.  If such adherence to state and local procedures were required of bankruptcy courts here, why not elsewhere, throughout the Bankruptcy Code and reorganization proceedings generally?  Such was obviously not the intent of Congress.

21

ANC recognizes that the recently-enacted Bankruptcy Reform Act (and which applies only to bankruptcy proceedings initiated on or after October 17, 2005) does, for the first time, add a provision specifically restricting the availability of relief (including court "determination" of taxes under § 505), to the time periods during which such relief would be available under non-bankruptcy law.  However, since, obviously, these restrictions are not yet law, and have no relevance to the instant case, the fact that Reform Act proponents felt it necessary to specifically add them further evidences the fact that they have not, historically, been part of § 505.  Accordingly, "legislation by implication" in this area, and the resulting denial of subsequent consideration of otherwise-valid partial refund claims, is inequitable and inappropriate.


E.      CONCLUSION

*Custom Distributing* warps Bankruptcy Code § 505 out of resemblance to its original remedial purposes and carefully crafted scope and limitations.  As a result, a Code section expressly enacted to prevent tax offices profiting from the neglect of distressed companies, at the expense of debtors and other creditors, has been stripped of most of its vitality, making the express restrictions imposed on new bankruptcies by the 2005 Bankruptcy Reform Act very much an anti-climax, at least as to § 505.

More than once, the United States Supreme Court has cautioned lower federal courts to enforce federal code and statutory provisions, including the United States Bankruptcy Code, according to their express statutory language.  See, e.g., *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000), citing *Connecticut National*

22

*Bank v. Germain*, 503 U.S. 249, 252 (1992). Regrettably, the Third Circuit chose otherwise, in crafting its decision in *Custom*.

The one remaining area, however, where jurisdiction unquestionably remains, is as to unpaid taxes, including the Unpaid Taxes in this case. Moreover, abstention was without basis given the nature of the issue, and its grant was an abuse of discretion by the court below. Accordingly, while ANC prays for relief from the flawed reasoning and application of *Custom* with respect to refund requests concerning paid taxes, it strenuously urges relief in the form of reversal and remand of the claims concerning Unpaid Taxes on ANC's airport rental car fleet for tax year 2001.

Dated: August 12, 2005.

Respectfully submitted,


 */s/ Joseph Grey*
Joseph Grey (No. 2358)
Thomas G. Whalen, Jr. (No. 4034)
STEVENS & LEE, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
Telephone: (302) 654-5180
Telecopier: (302) 654-5181

Joseph M. Harrison IV
J.M. HARRISON & ASSOCIATES
1009 C Street, Suite 200
Floresville, Texas 78114-2223
Telephone: (830) 393-0500
Telecopier: (830) 393-4941
ATTORNEYS FOR APPELLANTS

23